Frank Sible, Appellee, v. Wells Brothers Company, Appellant.

Gen. No. 14,499.

1. MASTER AND SERVANT—*when vice-principal cannot recover.* A vice-principal cannot recover for the breach of those duties of the master which he as vice-principal has duly assumed to perform upon behalf of the master.

2. MASTER AND SERVANT—*when vice-principal cannot recover.* A foreman or vice-principal cannot recover from his master for injuries due to the neglect of an employe hired by him and under his direction and control or for defects in construction and maintenance of appliances which it was his duty to construct and maintain.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1908. Reversed with finding of fact. Opinion filed April 20, 1909. Rehearing denied April 30, 1909.

Statement by the Court. Frank Sible, appellee, recovered a judgment in the Superior Court against Wells Brothers Company for personal injury, from which this appeal is prosecuted.

The evidence in the record tends to show that the defendant, Wells Brothers Company, was engaged in the business of erecting buildings as contractors. In June, 1905, it had the contract for the masonry work of the annex to the Union League Club building in

the city of Chicago, near the corner of Jackson boulevard and Custom House place.

This building had progressed to a considerable height, and the mason work was being done several stories above the floor where the accident in question occurred. Frank Sible, appellee, was foreman for appellant over the mason work. Other foremen were in charge of other departments of the work, and Frank Lyons was superintendent in charge of the entire work of appellant on the premises.

The basement of the building was ten or twelve feet below the first floor level and included the entire site of the new building. Along the south wall of the new building and extending from the street on the east to the alley on the west, there was constructed a floor ten or twelve feet wide and from twelve to eighteen inches below the level of the street sidewalk. This floor is termed "mezzanine" floor.

For the purpose of facilitating the handling of materials and doing the work, it was necessary to have floors and platforms about on the street level. Almost the first work, accordingly, which appellant did under its contract was the construction of a platform or scaffold along the north side of the new building from the street to the alley. This platform was about fifteen feet wide, and it was connected with the so-called mezzanine floor by extending a platform from fifteen to twenty feet wide. Beneath this connecting platform and about the middle of it, a hoisting engine was placed for the purpose of hoisting the materials necessary to be used in executing the contract; and a regular hoist was constructed extending from the basement to the top floor of the building.

Appellee Sible was the foreman under whose direction and control the mezzanine floor and the other floors or scaffolds, and the appliances, were constructed. He had charge of their inspection and maintenance. He attended to the hiring and discharging of the men who were engaged in this work, and also

all the men who were thereafter engaged in the operation of these instrumentalities, and in the doing of the mason work. He had charge also of all the work necessary to be done to keep the masons supplied with materials, including the hoisting appliances, and the laborers. He received $7 a day from appellant for his services as such foreman.

There was an understanding between the Club and appellant that when the Club could spare the steam for running the hoisting engine appellant could use it. But, early in the work it developed that the Club had not sufficient steam for its own purposes and for running the hoisting engine as well, and so appellant found it necessary to generate steam in the boiler of the hoisting engine. For this purpose it was necessary to use coal. A coal bin was constructed under this crossing platform near the engine. The smoke stack extended up through this platform and some feet above it. Around the smoke stack a framework was constructed, and boards were laid close to it. A board extended from the smoke stack to the west edge of the platform, and directly over the coal bin. Coal for the engine was brought to the building and dumped in the street, and then some laborer under Sible wheeled it into the building in a wheelbarrow over this platform, and taking up this board dumped the coal into the bin.

Some three or four weeks before the accident, there was a teamsters' strike in Chicago and for that reason the coal men could not deliver coal. In order to get coal, Frank Lyons, appellant's superintendent, told Sible it would be necessary to send some discreet man and have it brought to the building, suggesting or requesting that one Joyce, one of the laborers employed by Sible, should be sent to get the coal. Sible told Joyce what was wanted and sent him to Lyons, who would explain matters. Joyce thereupon went to Lyons, who directed him to procure an express wagon and go to a certain place, load the wagon with coal

and bring it to the building. This was done and the coal was unloaded in the street, and then taken into the building and dumped into the bin in the usual way.

On June 4th or 5th, the strike conditions still prevailing, Joyce was sent after a load of coal. He brought the coal to the building and took it into the building and dumped it into the bin as usual.

In his conduct of the work Sible was at different times in all parts of the building. On the day of his injury he had twenty or thirty men on the upper floors of the building and five or six men, including Joyce, working in and about the basement. Sible was on the upper floors most of the day. During the noon hour he was passing along this platform, intending to look at some mortar boxes which were in the basement to the west of the platform. It was his duty to see that mortar was kept in sufficient quantities to keep the men supplied. He walked to the edge of the platform for the purpose of looking over it, and stepped upon this particular board which had been taken up for the purpose of dumping the coal into the bin. The board not being securely fastened, or not fastened at all, tipped down over the west stringer on which it rested, and Sible fell into the basement, breaking a bone of one foot.

The declaration consists of three counts, which, in slightly varying language, aver that appellee, Sible, was an employe of appellant; that it was the duty of appellant to provide him a safe place in which to work; that appellant, in violation of such duty, provided an unsafe place, to wit, a floor or platform upon which there was a loose plank, and that appellee, while exercising ordinary care for his own safety, stepped upon such loose plank, causing him to fall and to sustain the injuries complained of.

Appellant pleaded the general issue. The trial of the cause resulted in a verdict in favor of appellee for $1200. The court overruled appellant's motions for a

new trial and in arrest of judgment, and entered judgment on the verdict.

At the close of appellee's evidence, and again at the close of all the evidence, appellant moved to exclude all the evidence and to direct a verdict for appellant, submitting with each motion an instruction to find appellant not guilty. The court denied the motions and marked the instructions refused.

KRAUS, ALSCHULER & HOLDEN and W. J. WELDON, for appellant.

DARROW, MASTERS & WILSON, for appellee.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

The negligence averred in the first count of the declaration was the failure of appellant to provide for appellee a safe place in which to work.

The following evidence in the record is practically uncontradicted. The witness Koenig, called by appellee, testified that appellee was foreman over the masons and laborers at the Union League Club. "I was working under his (Sible's) rules and building the platform under his rules, and the men with me were working under his rules and directions. He was about there when the platform was being built and gave me directions what to do, but didn't tell us how to do it. I knew how to build it * * * I came to work there and worked there until April, some part of April. All that time I was working under Sible as foreman, and the men who were working on and about that platform after it was constructed were under the same man, Sible, the plaintiff. He had the hiring and discharging of the men. This was an addition to the Union League Club House fronting east on Custom House place. I belonged to the laboring department and the laboring department was under the foremanship of Sible."

Appellee himself testified: "I was on the building from the foundation up as a mason foreman.    *    *    * When I started the job in order to get the brick off the street I had to put in planking and make a platform there. The platform was made on stringers, the planks running east and west and the stringers north and south. I had my men build it—the laborers built it    *    *    *    I hired the laborers, the helpers and the masons on the job.    *    *    *    If the work of these men did not suit me most undoubtedly I would discharge them or correct them in some way. That was my business. It was my business to be there and know and find out whether the men were competent or incompetent, and to observe whether the men were careless in their work or careful and did their work right.    *    *    *    These scaffolds and platforms were built by the men under me and it was under my general direction and supervision in a way that these platforms were built. I brought Kenny (Koenig) over there to put this platform down, he being the scaffolding man. I told him what I wanted and he done it. If I saw he was not doing it right, I would stop him. That was my business—part of the business I was hired for, certainly."

This is appellee's testimony as to the construction of the platform. As to the duties of appellee regarding its maintenance his testimony is equally clear and comprehensive. He says: "As foreman in charge there in going around these different places, I was supposed to keep my eyes open and see the condition of things. If I saw anything wrong or out of the way there with workmen or with appliances in my line, it was my duty to call attention to it and see that.it was corrected.    *    *    *    As I passed around these different places it was certainly my duty to observe and see what the men were doing. My duty was to work for Wells Brothers and most undoubtedly it was my duty to do these very things that suggested themselves. If I would go around to these various platforms and dis-

cover a place where the nails were out and boards loose, I would certainly have sent a man there to have them fixed up. I had general charge of the hoisting of this stuff for the masons.  *  *  *  I made it a point to watch the boards in the platform as I go over them—that was a part of my duty.''

It is clear from his testimony, we think, that appellant looked to appellee, and had a right to look to him as between appellee and appellant, for careful supervision of the construction of the platform; also for the intelligent and watchful inspection and maintenance thereof, necessary to keep and maintain the platform and appliances under his control in a safe condition for use.

The question arises then, can appellee, Sible, who was charged with and assumed this duty in relation to this platform, for and in consideration of $7 per day, maintain this action against appellant for a violation of that same duty assumed by him and entrusted to him by appellant? In our opinion it would be unjust and contrary to the facts and the law to hold that appellee is entitled to recover under the facts and circumstances disclosed in the record.

It clearly appears, we think, that appellee was the vice-principal of appellant. ''When a master confers authority upon one of his employes to take charge and control of a certain class of workmen in carrying on some particular branch of his business, such employe, in governing and directing the movements of the men under his charge with respect to that branch of the business, is the direct representative of the master and not a mere fellow-servant.'' Wenona Coal Co v. Holmquist, 152 Ill. 581, 590.

''There are certain duties of the master that are non-assignable,—that is, when delegated to another, that other occupies the relation of vice-principal, for whose negligence and want of care the master is responsible. Among such duties, with the assumption by the servant of the ordinary hazards in such case,

are, that he shall exercise reasonable care to see that tools, appliances and machinery are reasonably safe, and must use reasonable care that the place where the servant works is reasonably safe; to exercise ordinary care in the selection of superintending fellow-servants, and where he has notice of the unfitness of a fellow-servant, to discharge him; * * * to use reasonable care to keep in repair machinery, tools and appliances with which and where the servant is employed." M. & O. R. R. Co. v. Godfrey, 155 Ill. 78, 82; Baier v. Selke, 211 *id.* 512, 517; Schillinger Bros. Co. v. Smith, 225 *id.* 74, 79.

The alleged negligence of appellant being, if negligence at all, necessarily the negligence of appellee, its vice-principal, it follows, we think, that for injury growing out of negligence so attributable to himself, the vice-principal cannot recover.

Furthermore, on the same principle, we think a foreman or vice-principal cannot recover from his master for injuries due to the neglect of an employe hired by him and under his direction and control, or for defects in construction and maintenance of appliances which it was his duty to construct and maintain.

In the case of Evans v. A. & P. R. R. Co., 62 Mo. 49, the plaintiff was a station master of the defendant, and had charge and management of all the freight trains within his division and on him the special duty was placed of keeping the track clear of obstruction. He was injured while crossing the railway in attending to his own personal affairs, his injuries being due to the negligence of an engineer in failing to sound the bell on his engine. In affirming the action of the lower court in instructing the jury that the plaintiff could not recover, the Supreme Court, at page 59, said: "It is clear that being an agent of the company, and required by the regulations to superintend the freight trains, he could not hold the company responsible for any negligence of the servants of the company, who were subject to his orders. He was, as station agent,

especially intrusted with the duty of attending to freight trains; to see that they were loaded and unloaded, and to see that they were properly secured on the side track or switches. That because he was neglecting his duty at the time the accident happened, he is entitled to claim the rights of a stranger, is too monstrous a proposition to be conceded. The liabilities of the company depend on his rights as an employe. His employment, as is conceded, involved the control of the train by which he was injured, and this concession alone exempts the defendant, and the court, therefore, properly gave the instruction complained of."

Erskine v. Chino Val. Beet-Sugar Co., 71 Fed. Rep. 270, was a case where the plaintiff's decedent was killed through the breaking of a defective rope, while engaged in washing windows at a high elevation outside of defendant's building. The deceased was a foreman of the defendant's rigging gangs and had control and charge of all ropes, tackle and other hoisting appliances about defendant's factory, and it was his duty to inspect them. In deciding the case the court said:

"The servant does not undertake to incur the risks arising from negligence in providing suitable and safe material or other instruments with which he is to work. His contract implies that, in regard to these matters, his employer will exercise due care in making adequate provision that no danger shall ensue to him; and this duty the master can not delegate to a servant, so as to exempt himself from liability for injuries caused to another servant by its omission. It will be observed from this language, however, that it cannot apply when the injured person is himself the servant to whom the master delegated the duty whose omission caused the injuries.   *   *   *   The deceased, by virtue of his employment for a long period of time at the factory, had charge of all the defendant's rope and tackle and hoisting appliances and that it was his duty to inspect them. From these facts two conclusions inevitably result, namely:  That the deceased had

equal means of knowledge with the defendant as to the defect in the rope; and, further, if there was any negligence in not discovering said defect, such negligence was the negligence of the deceased."

In I. C. R. R. Co. v. Barslow, 94 Ill. App. 206, 213, this court laid down the rule announced in the above cases as follows: "Here the very care which the appellant undertook to exercise in order that its cars might not be used while couplings were defective, was intrusted to appellee and his fellow train men. The appellant was obliged to entrust to some of his employes this task. It was intrusted to appellee, and if he failed in performance, such failure cannot be permitted to create a liability to himself." See also C. & A. R. R. Co. v. Merriman, 95 Ill. App. 628. And so in I. C. R. R. Co. v. Jewell, Admx., 46 Ill. 99, it was held that a railroad company will not be held liable for injuries sustained by one of its servants in the course of his employment, when such injuries resulted from his own neglect to perform a duty, the performance of which might have avoided the accident."

The second count is predicated on the same theory as the first count above discussed, but avers the duty with reference to providing a safe approach over which plaintiff could pass in going to his work, and avers that the loose plank was in the mezzanine floor. Clearly this count was not sustained by the evidence, for the loose plank was in the platform and not in the mezzanine floor.

The third count of the declaration avers that appellant was negligent in failing to keep the plank or flooring in a safe condition. The authorities cited above apply to the case stated in this count.

The evidence shows that Joyce was under the control of Lyons, the general superintendent of appellant, while he procured a wagon and went for coal during the teamsters' strike, and perhaps in unloading it in the street in front of the building. But when he commenced to carry the coal into the building, and in

putting it into the coal bin, he was performing his usual duties at the building, and was under the control and direction of Sible, his foreman. Sible himself testified: ''If the coal was dumped inside there was no trouble about it, my laboring men would do that work, wherever the coal came from, whether by express wagon or coal wagon. I knew that the coal had to be wheeled in and dumped down, as the witnesses have described, in this coal box.'' He further said: ''I recall that Lyons said to me, 'It is necessary to send off somewhere and get coal; we can't get it in the usual way. Let me have a bright man of yours who is all right and send him off to bring that coal,' or something of that kind.. * * * I told him Joyce would be a good man and he asked for him and I gave him to him. This was several weeks before the accident.''

The witness Telfer's testimony shows that when the coal was dumped in the street, Joyce or some other laborer would bring the coal in.

We do not think, upon a review of the testimony that the contention of appellee that Joyce was acting directly under the orders of Lyons while he was wheeling the coal in from the street, is justified or warranted by the evidence. We do not find in the record that Lyons gave Joyce, or any other laborer any directions in regard to that work. Joyce testified that when the first load of coal which he brought was unloaded at the building, some two or three weeks before the accident, Sible ordered him to take it in by means of a wheelbarrow and dump it through the platform into the coal box. On the other hand we draw the inference from the evidence that Joyce and other laborers were under Sible's direction and authority while taking the coal in from the street. It was undoubtedly the duty of the laborers under Sible to bring the coal into the building. In the absence of any proof as to particular directions during the teamsters' strike, the natural and reasonable inference from the evidence is

that the men in doing that work were discharging their duties as laborers under Sible's foremanship.

The precise act of negligence, however, if it was negligence, consisted in not nailing down the plank while the load of coal was being put in the coal box. The evidence of Keefe is that Joyce had not finished putting in the coal by noon, and that he temporarily "clapped" down the plank at noon without nailing it, and that it was apparent from the conditions on the platform that the putting in of the load of coal had not been completed before the accident. Telfer testified that it was customary to nail down the plank when they finished putting in a whole load of coal. Further, there is some conflict in the evidence as to whether or not this particular plank had ever been fastened. Joyce says that at the times he raised the plank to put coal in the box it was loose and had not been nailed, and that each time he put it back loose as he found it.

It is difficult, however, to see how either state of facts relieves appellee, or takes the case out of the principle of law above applied. If the plank ought to have been fastened, but never was fastened, appellee in his general supervision over the construction and maintenance of the platform cannot complain of injury to himself resulting from his own omission to do effectively what he was employed to do. If, on the other hand, the practice was to pull up this board and nail it down again in the necessary operation of dumping the coal through this particular opening, appellee should know or did know of such practice and that such practice in time would probably impair the holding qualities of the nails upon the stringers, and furthermore, that one of his laborers might inadvertently fail to nail the plank. Nor will the reasonable theory based on Keefe's and Telfer's evidence avail appellee. Keefe testified that Joyce had not finished putting in the load of coal at the noon hour, and that he temporarily "clapped" down the plank at noon without nailing it; and that the conditions around there indicated

that the load had not been disposed of fully at the time of the accident; and Telfer says that this practice was usual. Sible, of all persons connected with the work being done, was chargeable with knowledge of all things within the very essence of his duties there, and particularly that such condition as that which he alleges caused the injury to himself did not exist.

Under the law and on the evidence we are of the opinion that Sible cannot recover in this case and that the judgment of the Superior Court must be reversed with a finding of fact.

*Reversed with finding of fact.*